IN THE UNITED STATES DISTRICT COURT
FOR THE WESTERN DISTRICT OF PENNSYLVANIA

| | |
|---|---|
| SUSAN E. BOWERS, | ) |
| | ) |
| Plaintiff, | ) |
| | ) |
| vs. | ) Civil Action No. 06-208 |
| | ) |
| JO ANNE B. BARNHART, | ) |
| Commissioner of Social Security, | ) |
| | ) |
| Defendant. | ) |

**MEMORANDUM OPINION**

**I.   INTRODUCTION**

Pending before the Court are cross-motions for summary judgment filed by Plaintiff Susan E. Bowers and Michael J. Astrue, Commissioner of Social Security.[1]  Plaintiff seeks review of a final decision by the Commissioner denying her claim for disability insurance benefits ("DIB") under Title II of the Social Security Act, 42 U.S.C. §§ 401 *et seq.*[2]  For the reasons discussed below, Plaintiff's motion is granted and she is awarded benefits as of her onset date.  Defendant's motion is denied.

---

[1]   Pursuant to Fed. R. Civ. P. 23(d)(1), Michael J. Astrue, who became Commissioner of Social Security on February 12, 2007, is substituted for Jo Anne B. Barnhart in this action; *see also* 42 U.S.C. § 405(g) ("Any action instituted in accordance with this subsection shall survive notwithstanding any change in the person occupying the office of Commissioner of Social Security or any vacancy in such office.")

[2]   To be granted a period of disability and receive disability insurance benefits, a claimant must show that she contributed to the insurance program, is under retirement age, and became disabled prior to the date on which she was last insured.  42 U.S.C. § 423(a).  The parties do not dispute the ALJ's finding that Ms. Bowers's date last insured will be December 31, 2009.

## II.   **BACKGROUND**

### A.   Factual Background

Susan Bowers worked from 1987 through 2004 as a clerk-typist for the Pennsylvania Department of Transportation ("Penn DOT"), despite having been diagnosed first with schizophrenia and then with bipolar disorder.[3] (Certified Copy of Transcript of Proceedings before the Social Security Administration, Docket No. 7, "Tr.," at 106, 525-527.)   On November 18, 2002, she was involuntarily admitted to the psychiatric ward at Altoona Regional Hospital for 15 days after her family became concerned about her erratic behavior.   After a period of recovery, she returned to work, but was re-admitted to the hospital from May 20 through June 3, 2003.  She returned to work full-time as of mid-September, 2003, but was placed on temporary disability again on May 24, 2004, after her depressive symptoms returned.   Although her psychiatrist, Dr. Joseph L. Antonowicz, continued for sometime to be hopeful that she

---

[3]   Bipolar disorder is a mental condition resulting from disturbances in the areas of the brain that regulate mood and is characterized by periods of excitability (mania) alternating with periods of depression.   During manic periods, a person with bipolar disorder may be overly impulsive and energetic, with an exaggerated sense of self.   The depressed phase brings overwhelming feelings of anxiety, low self-worth, and suicidal thoughts.   The mood swings between mania and depression can be very abrupt, or manic and depressive symptoms may occur simultaneously or in quick succession in what is called a mixed state.   There is a high risk of suicide with bipolar disorder.   The condition is treated with mood-stabilizing medications such as valproic acid, lithium, and carbamazepine.   *See* the National Institute of Medicine's on-line website, Medline Plus, at www.nlm.nih.gov/medlineplus/druginfo (last visited June 25, 2007), "Medline Plus."

2

could recover sufficiently to return to work, on October 9, 2005, Ms. Bowers was once again committed to Altoona Regional Hospital where she remained for ten days.

In a disability report completed on September 7, 2004, Ms. Bowers stated she was unable to work due bipolar disorder, neurogenic bladder, diverticulitis, degenerative disc disease of the neck, and spinal curvature. (Tr. 95.) As a result of these conditions, she was unable to lift objects or stand for long periods of time and experienced difficulty concentrating, constant fatigue, and nausea from her numerous medications. (Tr. 96.)

B.    Procedural Background

On August 4, 2004, Ms. Bowers protectively filed for a period of disability and disability insurance benefits, claiming that she had become disabled as of May 24, 2004. (Tr. 103.) Her application was denied on December 30, 2004 (Tr. 29-33),[4] after which Plaintiff timely requested a hearing before an Administrative Law Judge ("ALJ") on March 7, 2005. (Tr. 37-39.)

On January 3, 2006, hearing was held before the Honorable Douglas W. Abruzzo at which Plaintiff was represented by counsel. Judge Abruzzo issued his decision on April 28, 2006, again denying benefits. (Tr.12-22.) The Social Security Appeals Council chose

---

[4]    Curiously, the letter from the Social Security Administration contains no reference to having reviewed any medical reports of Dr. Antonowicz who began treating her in July 2002.

3

not to review the ALJ's decision on August 18, 2006[5] (Tr. 4-6);
therefore, the April 28, 2006 opinion became the final decision of
the Commissioner for purposes of review.   42 U.S.C. § 405(h);
Rutherford v. Barnhart, 399 F.3d 546, 549-550 (3d Cir. 2005),
citing Sims v. Apfel, 530 U.S. 103, 107 (2000).  Plaintiff filed
suit in this Court on September 26, 2006, seeking judicial review
of the ALJ's decision.

## C.   Jurisdiction

This Court has jurisdiction by virtue of 42 U.S.C.
§ 1383(c)(3) (incorporating 42 U.S.C. § 405(g)) which provides that
an individual may obtain judicial review of any final decision of
the Commissioner by bringing a civil action in the district court
of the United States for the judicial district in which the
plaintiff resides.

## III. STANDARD OF REVIEW

The scope of review by this Court is limited to determining
whether the Commissioner applied the correct legal standards and
whether the record, as a whole, contains substantial evidence to
support the Commissioner's findings of fact.  42 U.S.C. § 405(g);
Richardson v. Perales, 402 U.S. 389 (1971); Schaudeck v. Comm'r of
Soc. Sec. Admin., 181 F.3d 429, 431 (3d Cir. 1999).  Findings of

_____

[5]  Usually, the next step in the administrative procedure would
be for the Social Security Appeals Council to reconsider the ALJ's
decision to determine if there had been an error of law or abuse of
discretion on his part.  In selected test cases, however, this review
step has been omitted.  See 20 C.F.R. § 404.966 and § 416.1466.

4

fact by the Commissioner are considered conclusive if they are supported by "substantial evidence," a standard which has been described as requiring more than a "mere scintilla" of evidence, that is, equivalent to "such relevant evidence as a reasonable mind might accept as adequate to support a conclusion." Richardson, id. at 401. "A single piece of evidence will not satisfy the substantiality test if the [ALJ] ignores, or fails to resolve a conflict, created by countervailing evidence." Kent v. Schweiker, 710 F.2d 110, 114 (3d Cir. 1983).

This Court does not undertake de novo review of the decision and does not re-weigh the evidence presented to the Commissioner. Schoengarth v. Barnhart, 416 F. Supp.2d 260, 265 (D. Del. 2006), citing Monsour Medical Center v. Heckler, 806 F.2d 1185, 1190 (3d Cir. 1986) (the substantial evidence standard is deferential, including deference to inferences drawn from the facts if they, in turn, are supported by substantial evidence.)  If the decision is supported by substantial evidence, the Court must affirm the decision, even if the record contains evidence which would support a contrary conclusion. Panetis v. Barnhart, No. 03-3416, 2004 U.S. App. LEXIS 8159, *3 (3d Cir. Apr. 26, 2004), citing Simmonds v. Heckler, 807 F.2d 54, 58 (3rd Cir. 1986), and Sykes v. Apfel, 228 F.3d 259, 262 (3rd Cir. 2000).

## IV.  LEGAL ANALYSIS

### A.   The ALJ's Determination

In determining whether a claimant is eligible for disability insurance benefits, the burden is on the claimant to show that she has a medically determinable physical or mental impairment (or combination of such impairments) which is so severe she is unable to pursue substantial gainful employment[6] currently existing in the national economy. The impairment must be one which is expected to result in death or to have lasted or be expected to last for not less than twelve months.  42  U.S.C. § 1382c(a)(3)(C)(i); Morales v. Apfel, 225 F.3d 310, 315-316 (3d Cir. 2000).

To determine a claimant's rights to DIB,[7] the ALJ conducts a formal five-step evaluation:

(1)  if the claimant is working or doing substantial gainful activity, she cannot be considered disabled;

(2)  if the claimant does not suffer from a severe impairment or combination of impairments that significantly limits her ability to do basic work activity, she is not disabled;

(3)  if the claimant does suffer from a severe impairment

---

[6]  According to 20 C.F.R. § 404.1572, substantial employment is defined as "work activity that involves doing significant physical or mental activities. . . . Work may be substantial even if it is done on a part-time basis." "Gainful work activity" is the kind of work activity usually done for pay or profit.

[7]  The same test is used to determine disability for purposes of receiving either DIB or supplemental security income benefits.  Burns v. Barnhart, 312 F.3d 113, 119, n1 (3d Cir. 2002).  Therefore, courts routinely consider case law developed under either type of benefits.

> which meets or equals criteria for an impairment listed
> in 20 C.F.R. Part 404, Subpart P, Appendix 1 ("the
> Listings") and the condition has lasted or is expected to
> last continually for at least twelve months, the claimant
> is considered disabled;

(4) if the claimant retains sufficient residual functional
capacity ("RFC")[8] to perform her past relevant work, she
is not disabled; and

(5) if, taking into account her RFC, age, education, and past
work experience, the claimant can perform other work that
exists in the local, regional or national economy, she is
not disabled.

20 C.F.R. § 404.1520(a)(4); see also Morales, 225 F.3d at 316.

In steps one, two, and four, the burden is on the claimant to

present evidence to support her position that she is entitled to

Social Security benefits, while in the fifth step the burden shifts

to the Commissioner to show that the claimant is capable of

performing work which is available in the national economy.[9] Sykes

v. Apfel, 228 F.3d 259, 263 (3d Cir. 2000).

Following the prescribed analysis, Judge Abruzzo first

concluded that Ms. Bowers had not engaged in substantial gainful

activity at any relevant time, i.e., since her alleged onset date

of May 24, 2004, through the date of his decision, April 28, 2006.

---

[8] Briefly stated, residual functional capacity is the most a
claimant can do despite her recognized limitations. Social Security
Ruling 96-9 defines RFC as "the individual's maximum remaining ability
to perform work on a regular and continuing basis, i.e., 8 hours a
day, for 5 days a week, or an equivalent work schedule."

[9] Step three involves a conclusive presumption based on the
listings, therefore, neither party bears the burden of proof at that
stage. Sykes, 228 F.3d at 263, n2, citing Bowen v. Yuckert, 482 U.S.
137, 146-147 n5 (1987).

(Tr. 16.)   In resolving step two in Plaintiff's favor, the ALJ found that she suffered from a neurogenic bladder,[10] bipolar disorder, low back pain, neck pain as the result of a small herniation at C6-7 and a disc bulge at C4-5, and obesity, all of which were "severe impairments" as that term is defined by the Social Security Administration.[11]   (Id.)   He also concluded, however, that her hypertension was not severe because it was well-controlled with medication, nor was her uveitis[12] severe because despite that condition, her visual acuity, field and function were all normal or close to normal.  (Tr. 402-403.)  Similarly, the ALJ concluded her allergic rhinitis[13] was not severe because it had not

_____

[10]   Neurogenic bladder is a urinary problem in which the bladder either empties spontaneously or does not empty at all.  Common causes of the condition are nervous system tumor, trauma, neuropathy, or inflammatory conditions such as multiple sclerosis.  Medline Plus.

[11]   See 20 C.F.R. §§ 404.1520(c), 404.1521(a), and 140.1521(b), stating that a physical impairment is severe only if it significantly limits the claimant's "ability to do basic work activities," i.e., "abilities and aptitudes necessary to do most jobs, including, for example, walking, standing, sitting, lifting, pushing, pulling, reaching, carrying or handling," as compared to "a slight abnormality" which has such a minimal effect that it would not be expected to interfere with the claimant's ability to work, regardless of his age, education, or work experience.  Yuckert, 482 U.S. at 149-151.  The claimant has the burden of showing that the impairment is severe.  Id. at 146, n5.

[12]   Uveitis is an inflammation of the uvea, the layer of the eye between the sclera and the retina.  The condition can be caused by autoimmune disorders, infection, or exposure to toxins and may affect one or both eyes.  Symptoms include redness of the eye, blurred vision, sensitivity to light, dark, floating spots in the vision, and eye pain.  Medline Plus.

[13]   Allergic rhinitis is a collection of symptoms in the nose and eyes, caused by airborne particles of dust, dander, or plant pollens in people who are allergic to these substances.  Medline Plus.

8

resulted in hospitalization, operative procedures or treatment by a specialist during the period at issue. (Tr. 16-17.)

At step three, the ALJ concluded that none of Plaintiff's impairments satisfied any of the criteria in the relevant Listings, i.e., Listing 1.04 (disorders of the spine), 6.00 (genitourinary impairments), or 12.04 (affective disorders). He also considered the effects of Ms. Bowers's obesity on those impairments as described in Listing 1.00 (musculoskeletal system), 3.00 (respiratory system) and 4.00 (cardiovascular system), concluding that her obesity had not resulted in any conditions which met the requirements of those categories. (Tr. 17-18.)

At step four, the ALJ found that Ms. Bowers could not perform her past relevant work as a clerk-typist as it is generally performed in the national economy since she was limited to engaging in unskilled work. (Tr. 21.) However, relying on the testimony of the vocational expert ("VE") at the hearing, Dr. Joseph Bentivegna, the ALJ concluded that although Ms. Bowers could not perform the full range of medium work,[14] a significant number of jobs existed in the national economy which she could perform, e.g., stock clerk, receiving clerk, mail machine operator, laundry assistant, billing clerk, hand collator, labeler, and work

[14] Social Security Regulations define medium work as work involving lifting no more than 50 pounds at a time with frequent lifting or carrying of objects weighing up to 25 pounds, and the ability to stand and/or walk six hours in an eight-hour workday. 20 C.F.R. § 404.1567(b).

9

distributor.[15]   (Tr. 22.)   Therefore, based on her status as a individual closing approaching advanced age[16] with at least a high school education, a work history of semi-skilled occupations but no transferable skills, her RFC, the medical evidence of record, and the testimony of the VE, the ALJ determined at step five that Ms. Bowers was not disabled and, consequently, not entitled to benefits.  (Tr. 20.)

B.  Plaintiff's Arguments

Plaintiff argues Judge Abruzzo erred as a matter of law in denying her claim for disability benefits because substantial evidence supports a finding that her mental health problems[17] preclude her from engaging in any substantial gainful activity. (Plaintiff's Brief in Support of Motion for Summary Judgment,

---

[15]   The Court notes that the ALJ clearly erred by concluding that Ms. Bowers could perform medium work based on the VE's testimony.  Dr. Bentivegna actually testified that he was excluding medium-level work from his consideration, but would provide a list of jobs which could be performed at the sedentary or light levels.  (Tr. 561.)  As a person closely approaching advanced age and with her other limitations as noted in the text above, Ms. Bowers would be presumed disabled if she were limited to sedentary work. See 20 C.F.R. Pt. 404, Subpt. P., App.2, Table 1, Rule 201.14.  On the other hand, she would not be presumed disabled if she could perform light work.  See id., Table 2, Rule 202.14.  The ALJ appeared to acknowledge this distinction at the hearing (see Tr. 561-562), but did not limit Ms. Bowers to light or sedentary work in his written decision. However, in view of our conclusion that Ms. Bowers should have been considered disabled at step 3 of the process, we do not address this issue further.

[16]   Plaintiff was 53 years old at the time of the hearing, meaning that she fell within the category described as approaching advanced age, i.e., ages 50-54.  20 C.F.R. § 404.1563(c).

[17]   Plaintiff does not argue that the ALJ's analysis of her physical impairments was flawed, therefore we do not address that portion of his decision.

10

Docket No. 9, "Plf.'s Brief," at 4.) In particular, the ALJ erred by concluding that Plaintiff had experienced no episodes of decompensation[18] during the period in question and demonstrated only mild to moderate limitations in her activities of daily living, maintaining concentration, persistence or pace, and maintaining social functioning. These errors stem from the ALJ incorrectly giving insufficient weight to the findings of Plaintiff's psychiatrist, Dr. Antonowicz, because he found those reports "self-contradictory and rather illogical given [the doctor's] other reports." (Plf.'s Brief at 7-8, *citing* Tr. 19.) According to Ms. Bowers, a thoughtful examination of the mental health records reveals nothing contradictory or illogical about Dr. Antonowicz's opinions; to the contrary, those records demonstrate her "downhill slide" over a period of four years, despite "extensive use of psycho-tropic medications, three hospitalizations and a reduction in stress as a result of Plaintiff leaving her job." (Id. at 10.) Plaintiff asserts that she is disabled in that she satisfies Listing 12.04 or its equivalent. (Id. at 11.) The Court agrees.

C.    Analysis of Mental Impairments under Listing 12.04

The Social Security Administration has developed a special technique for reviewing mental disorder claims. Listing 12.04, affective disorders, addresses one of several mental

---

[18]   In psychiatry, decompensation refers to a "failure of defense mechanisms resulting in progressive personality disintegration." Medline Plus.

11

impairments, and requires the ALJ to compare the severity and effects of the claimant's condition to what are referred to as the A, B, and C criteria.

To meet the listing for affective disorders, i.e., those disorders "characterized by a disturbance of mood, accompanied by a full or partial manic or depressive syndrome," the claimant must satisfy the A criteria plus the B criteria, or, alternatively, satisfy the C criteria. The A criteria require that the claimant show the medically documented persistence, either continuous or intermittent, of depressive syndrome marked by four of nine specific characteristics;[19] manic syndrome with at least three of eight characteristics;[20] or bipolar syndrome with both manic and depressive characteristics.

To satisfy the B criteria, the claimant's depressive, manic, or bipolar syndrome must be of such severity that it results in at

---

[19]   These characteristics include anhedonia (total loss of feeling of pleasure in acts that normally give pleasure); appetite disturbance with change in weight; sleep disturbance; psychomotor agitation or retardation; decreased energy; feelings of guilt or worthlessness; difficulty concentrating or thinking; thoughts of suicide; or hallucinations, delusions, or paranoid thinking.  Listing 12.04A.

[20]   The characteristics of manic syndrome are hyperactivity; pressure of speech; flight of ideas; inflated self-esteem; decreased need for sleep; easy distractability; involvement in activities that have a high probability of painful consequences which are not recognized; or hallucinations, delusions or paranoid thinking. Listing 12.04A.

12

least two of the following: marked[21] restrictions in activities of
daily living ("ADLs"); marked difficulties in maintaining social
functioning; marked difficulties in maintaining concentration,
persistence, or pace; or repeated episodes of decompensation, each
of extended duration.[22]

To satisfy the C criteria of Listing 12.04, the claimant must
present medical evidence that his affective disorder has lasted at
least two years, resulting in "more than a minimal limitation of
ability to do basic work activities." The symptoms or signs of the
affective disorder must be currently attenuated by medication or
psychosocial support. The C criteria also require the claimant to
show one of the following: repeated episodes of decompensation,
each of extended duration; a residual disease process resulting in
such marginal adjustment that even minimal increases in mental
demands or change in the environment would be predicted to cause
the individual to decompensate; or a current history of one or more

---

[21] "Marked" is defined in the regulations as "more than moderate
but less than extreme." Listing 12.00C. "A marked limitation may
arise when several activities or functions are impaired, or even when
only one is impaired, as long as the degree of limitation is such as
to interfere seriously with [the claimant's] ability to function
independently, appropriately, effectively, and on a sustained basis."
Id. "Marked" is not defined by limitations on a specific number of
different activities in each category but rather the "nature and
overall degree of interference with function." Id.

[22] "Repeated episodes of decompensation, each of extended
duration," is defined as "three episodes within 1 year, or an average
of once every 4 months, each lasting for at least 2 weeks." Listing
12.00C(4).

13

years' inability to function outside a highly supportive living arrangement and an indication of the continued need for such an arrangement.

In this case, there is no question that the ALJ found that the medical diagnosis of bipolar disorder satisfied the A criteria. (Tr. 16.)  Briefly stated, the ALJ found that Plaintiff's mental condition did not satisfy the B criteria of Listing 12.04 for the following reasons:

> Ms. Bowers demonstrated no more than mild restrictions in her ADLs as a result of her psychological condition, as reflected by her ability to care for her personal needs, prepare simple meals, drive 30 miles per week, carry out a number of housekeeping tasks, go shopping with her mother, listen to the radio, pay her bills, attend church services two or three times a week, dine out weekly, visit other people, read her Bible, and write letters. (Tr. 17.)

> With regard to social functioning, she drives, eats out, attends church services, and visits others. There is no evidence of anti-social behavior such as fighting, evictions, or job loss due to psychiatric problems, nor evidence that she cannot interact appropriately with medical personnel. Thus Ms. Bowers demonstrated moderate difficulties maintaining social functioning, at most. (Tr. 17.)

> Ms. Bowers demonstrated no more than moderate difficulties maintaining concentration, persistence or pace, as substantiated by evidence that she could prepare simple meals, drive, shop, attend church, read her Bible, and write letters. (Tr. 18.)

> She had not experienced repeated episodes of decompensation during the period at issue. (Tr. 18.)

Judge Abruzzo further concluded that Ms. Bowers did not satisfy any of the three C criteria of Listing 12.04. (Tr. 18.)

14

D.    Plaintiff's Mental Health History

        Because we conclude that the ALJ (1) mischaracterized
much of the evidence of record; (2) improperly failed to give
controlling weight to Dr. Antonowicz's opinions; (3) failed to
explain his reasoning for concluding that Plaintiff's condition did
not satisfy or equal the C criteria of Listing 12.04; and (d)
failed to adequately explain his credibility finding, we provide a
detailed summary of Ms. Bowers's psychological medical records for
the period November 2002 through February 2006.

        Ms. Bowers was involuntarily admitted to the psychiatric unit
of Altoona Hospital on November 18, 2002, during a manic phase of
her bipolar disorder when her brother became concerned about her
incoherent speech, acting out, aggressive and violent behaviors,
and other psychotic symptoms.    Although Plaintiff had been
diagnosed in the 1970s with major depressive disorder with a
history of psychotic features - including two attempted suicides by
drug overdose -  she had not been hospitalized since approximately
1975.  Her family was concerned that her bizarre behavior in the
four days prior to admission had been caused by a change in
medication.   (Tr. 410-430.)   At some point after her release on
December 2, 2002, Ms. Bowers returned to work with Penn DOT.

        On May 20, 2003, Ms. Bowers was again involuntarily admitted

to the psychiatric unit of Altoona Hospital.[23]  On admission, her

Global Assessment of Functioning, i.e., "GAF" rating[24] was 25, and

even two days later, she was described by "disorganized and

psychotic" by the staff.  One of the major concerns of the medical

staff prior to release was her inability to be safe in her home and

to perform ADLs.  Although Ms. Bowers wanted to stay temporarily

with her mother, her mother indicated she was unwilling to have

Plaintiff live with her, stating that she had been unable to manage

the situation when Ms. Bowers had previously decompensated, nor

were Plaintiff's brothers willing to take the responsibility of

caring for her in their homes.  Plans were made for Ms. Bowers to

move temporarily into a personal care home, but by the time she was

released on June 2, 2003, her family and the medical staff had

agreed she would return to her own home and her mother and brothers

_____

[23]  Although the ALJ refers to the 2002 hospitalization in his
decision (see Tr. 18-19), the Court can find no reference to
Plaintiff's commitment in May/June 2003.

[24]  The Global Assessment of Functioning or "GAF scale" assesses
how well an individual can function according to psychological,
social, and occupational parameters, with the lowest scores assigned
to individuals who are unable care for themselves.  Drejka v.
Barnhart, CA No. 01-587, 2002 U.S. Dist. LEXIS 7802, *5, n2 (D. Del.
Apr. 18, 2002).  A GAF rating of 25 reflects behavior considerably
influenced by delusions or  hallucinations; serious impairment in
communication or judgment (e.g., sometimes incoherent, acts grossly
inappropriately, suicidal preoccupation); or the inability to function
in almost all areas (e.g., stays in bed all day; no job, home, or
friends).  See the on-line version of DIAGNOSTIC AND STATISTICAL MANUAL OF
MENTAL DISORDERS ("DSM-IV"), Multiaxial Assessment, American Psychiatric
Association (2002), at www.lexis.com., last visited June 25, 2007.
Neither Social Security regulations nor case law requires an ALJ to
determine a claimant's disability based solely on her GAF score.  See
Ramos v. Barnhart, CA No. 06-1457, 2007 U.S. Dist. LEXIS 23561,
*33-*34 (E.D. Pa. Mar. 30, 2007), and cases cited therein.

16

would provide 24-hour supervision for her ADLs and general monitoring. Her final diagnoses were of bipolar disorder type 1, mixed episode, decompensation of chronic mental illness; her GAF at discharge was 55, indicating moderate impairment in occupational or social functioning. (Tr. 168-186; *see also* DSM-IV, *supra* at n.24.)

Although Dr. Antonowicz began treating Plaintiff in July, 2002, his medical notes in the record begin following her release from the hospital in June 2003. At that time, she was experiencing a number of side effects from her medication including headaches, muscle stiffness, a rash, and breathing problems. During the first two office visits following her release, she was accompanied by her mother and brothers, who felt she was "doing quite well" and Dr. Antonowicz concluded that she had "a very satisfactory response to treatment." He noted, however, "I intend to follow her fairly closely as she had such a dramatic decompensation." He also encouraged her mother, who had been staying in Plaintiff's home, to allow Ms. Bowers to try living alone. (Tr. 499-501.)

After a six-week period in which Ms. Bowers was able to return to performing ADLs independently and resume her social life, Dr. Antonowicz released her to return to work part-time as of August 25, 2003, for a two-week trial period. Shortly before September 18, 2003, some three months after her release from the hospital, she went back to work on a full-time basis. At that time, her most significant side effect was "some degree of sedation," but her

17

sleep and appetite were normal and her mood described as "fairly good." There was no evidence of hypomania, psychosis, or distinctly depressive symptoms at the time. (Tr. 495-498.)

From September 18, 2003, through March 12, 2004, Ms. Bowers continued to work full-time and function without difficulty, despite lingering mild anhedonia, persistent fatigue, and weight-gain. (Tr. 492-494.) On May 20, 2004, however, she reported to Dr. Quentin R. Dolphin, who was filling in temporarily for Dr. Antonowicz, that she was feeling increasingly depressed. Although not suicidal, she was unable to function well at her job and felt lightheaded, "groggy," tired, and without energy. (Tr. 472.)

Although Ms. Bowers planned to return to work in late June, on June 21, 2004, Dr. Antonowicz described her as "far too distressed to make a return to work a realistic option at this time." (Tr. 469.) Throughout the summer, the doctor monitored Plaintiff closely. (Tr. 490-471.) Her depression waxed and waned but there were no signs of mania or psychosis. He noted sleep disturbances, anxiety, very poor concentration, and allergic reactions as he attempted to adjust her medications. In August, Dr. Antonowicz commented that Ms. Bowers was "functioning at her baseline," and was leading "a very limited existence essentially taking care of her own immediate needs and maintaining a degree of organization in her house, but really isn't fully functional." (Tr. 490.)

After deciding that Plaintiff could not return to work in

18

June, Dr. Antonowicz wrote to the Pennsylvania State Employees'
Retirement System on July 2, 2004, summarizing her condition and
noting problems with mood instability, e.g., cycles of depression
and hypomania.   He stated, "She has proven very difficult to
stabilize.   The natural history of bipolar disorder is over time to
become somewhat more difficult to manage; that certainly seems to
be the case here."   (Tr. 252-253.)   The response to her current
medication regimen of klonopin and lithium carbonate[25] was
"suboptimal" in that she "has continued mood symptoms, remains very
vulnerable to stressful situations and decompensates fairly
easily."   (Tr. 253.)   He concluded that although she could perform
her work duties "on an intermittent basis," her "illness renders
her prone to a more frequent decompensation than she had
experienced in the past."   (Id.)

     In response to a question by the State Employees' Retirement
System as to his evaluation of her ability to perform her work
duties, Dr. Antonowicz noted on October 13, 2004, that Ms. Bowers
was permanently disabled, her GAF was 48 (indicating serious
impairments in social or occupational functioning) and, despite

_____

[25]   Klonopin (clonazepam) is used to control seizures and to
reduce anxiety.   Lithium, one of several anti-manic agents, is used to
treat and prevent episodes of mania in patients with bipolar disorder
and works by decreasing abnormal activity in the brain.   Both drugs
have numerous side effects including dizziness, drowsiness, fatigue.
Medline Plus.

continued medication, she had shown "scant improvement."[26] (Tr. 372-373.) In December 2004, he noted persistent depressive symptoms and felt "she really is not functional in an occupational setting at this time." (Tr. 467.) By February 2005, he considered that she was stable, although the situation was still not entirely optimal. In April, he noted a "fairly low level of functioning," and commented that "she remains very sensitive to stress and I think could be easily pushed over into decompensation under the right set of adverse circumstances." In June 2005, although she was doing "reasonably well," he concluded "her degree of compensation seems to be marginal and I think it unlikely that she will be able to return to work in the immediate future." (Tr. 464.) Ms. Bowers continued to complain of medication side effects such as memory loss, sleep disturbances, and restless leg problems. (Tr. 464-466.)

On August 31, 2005, Dr. Antonowicz stated that Ms. Bowers "continues to do well on her present regime." (Tr. 488.) Less than two months later, on October 9, 2005, she was again admitted to the psychiatric unit at Altoona Hospital, apparently because of

---

[26] Defendant comments that in this report, Dr. Antonowicz "did not assess Plaintiff's mental ability to perform other work." (Defendant's Brief in Support of Motion for Summary Judgment, Docket No. 14, at 4.) However, nowhere in the medical report was the physician asked to provide such information; rather, the question asks only for an evaluation of "the patient's ability to perform the duties required by his/her Commonwealth employment." (Tr. 373.) The failure to answer a question which was not asked can hardly be considered substantial evidence to support denial of disability benefits.

agitation or other manic symptoms.[27] Although the hospital records are far less detailed than those from the two previous episodes, the notes include a final diagnosis of schizoaffective disorder, bipolar type, most recent episode, manic, and a GAF of 60 at discharge. Her psychosocial and environmental problems at the time of discharge were described as "severe."[28] (Tr. 502-503.) Again, her mother stayed with her when Plaintiff was released from the hospital. (Tr. 545-546; 556.)

In a follow-up appointment on November 30, 2005, Dr. Antonowicz noted that she was "in improved condition" after her hospitalization. He concluded "she is still too disabled to really return to work" even though she did not have symptoms of such severity that she needed to be hospitalized at the time.[29] He

---

[27] Again, the ALJ fails to mention this hospitalization in his opinion, although he was advised at the hearing that the records would be provided and agreed to kept the record open in order to admit them. (Tr. 565.)

[28] Mental disorders are described using a five "axis" method. Axis I refers to the patient's clinical disorders which are the focus of psychiatric treatment; Axis II refers to personality or developmental disorders; Axis III to general medical conditions; Axis IV to psychosocial and environmental problems; and Axis V provides an assessment of the individual's level of functioning, often by using a GAF score. *See* on-line version of DSM-IV, Multiaxial Assessment.

[29] Defendant interprets this portion of Dr. Antonowicz's notes as a determination that "she does not have symptoms of such severity to qualify for DIB." (Def.'s Brief at 12-13.) The Court finds this a rather strained reading of the physician's ambiguous report. In context, this portion of his note states, "She is still too disabled to really return to work and we discussed the notion of full time disability. Although she does not have symptoms of such severity and that needs to be in the hospital right now. [sic] She is not able to function in an occupational setting." (Tr. 485.) When read in the context of the complete paragraph as described in the text above, a

21

stated that she was not able to function in an occupational setting because of poor concentration, motivation and energy. He concluded, "Given the struggle that she has had with employment in the last two years, I think it unlikely that she will be able to have a successful return to work." (Tr. 485.)

On January 9, 2006, at the request of Plaintiff's counsel, Dr. Antonowicz completed a report concerning her present condition. After noting that she satisfied nearly every criterion of Listing 12.04 and had a current GAF of 50, he concluded:

> Ms. Bowers has a very fragile bipolar disorder. Repeated efforts to try to return her to work have failed. The prognosis for bipolar disorder in her circumstances is one of prospective deterioration.

(Tr. 482.)

The final note from Dr. Antonowicz dates from February 2, 2006, when he wrote, "at least maintaining a level of stability. No active psychosis. Organization of thinking remains good. Mood symptoms are stabilized. I think this might be the best we are going to get it." (Tr. 484.)

E. The ALJ's Errors

The Court finds the ALJ's analysis disorganized, full of errors both of fact and law, and, most troubling, based only on evidence selected to support his conclusion that Plaintiff was not

more reasonable interpretation of the unintelligible sentence fragment "Although she does not have symptoms of such severity and that she needs to be in the hospital right now" is not that he was voicing an opinion on her eligibility for DIB, but rather his opinion that her condition did not require hospitalization at that time.

22

disabled while ignoring multiple statements by her psychiatrist as to the severity of her impairments. We address each of those errors in turn.

1. *Mischaracterization of the evidence.* The ALJ mischaracterized the evidence on multiple occasions to the detriment of his analysis. For example, he misconstrued the testimony of Ms. Bowers's mother, stating that she had indicated Ms. Bowers was "sometimes incoherent and suicidal." (Tr. 18.) While her mother testified Ms. Bowers was incoherent after her release from the hospital in 2003, she clearly distinguished between the possibility Ms. Bowers might harm herself, e.g, burning herself when removing food from the microwave, and any suicidal tendencies. (Tr. 553-555.)

Second, the ALJ noted that, "[i]n October 2004, a physician employed by the Commonwealth noted the presence of a bipolar disorder and he concluded that the claimant was disabled." (Tr. 20.) While the ALJ does not state the exhibit to which he is referring, the only documents prepared by "a physician employed by the Commonwealth" dating from October 2004 which the Court can identify are Exhibit 15F, a Residual Functional Capacity Assessment-Mental, and Exhibit 16F, a Psychiatric Review Technique Form.[30] (Tr. 380-397.) However, at no point in those documents is

---

[30] Dr. Wafa Rizk performed a consultative examination on November 27, 2004 (Tr. 405-409), and Oliver French (sp?) completed a Residual Functional Capacity-Physical on December 17, 2004 (Tr. 431-438), but

23

there any conclusion that the reviewing physician, Dr. Kowalski, found Ms. Bowers disabled.[31] In fact, to the contrary, Dr. Kowalski concluded, "She can follow instructions and is capable of performing a variety of routine, non-complex tasks." (Tr. 392.)

Judge Abruzzo also wrote, "Testimony as to the claimant's disability due to her bipolar disorder is undercut by numerous statements by the claimant's treating psychiatrist as the claimant's continued improvement." (Tr. 21.) There is nothing in Dr. Antonowicz's notes which would logically lead to the conclusion that during the period June 2003 through February 2006 Ms. Bowers showed "continued improvement." Rather, a chronological review of the medical record shows that Ms. Bowers's ability to function independently fluctuated from total incapacity when hospitalized, through phases of highly structured support upon release, to severe then moderate depression, to stability, then back to manic behavior requiring further hospitalization.

Finally, the ALJ noted that "during the hearing, the claimant did not complain of any side effects from medications." (Tr. 21.) That is clearly a mischaracterization of her testimony. As of April 5, 2005, Ms. Bowers was taking ten different medications,

_____

neither the dates nor the determination that Plaintiff was disabled corresponds to the ALJ's statement. Thus, the Court has excluded those reports from consideration.

[31] The Court assumes Dr. Kowalski completed the psychiatric review technique form at Tr. 384-397 although it is not signed.

including Paxil,[32] lithium carbonate, and clonazepam for her depression, bipolar disorder, and anxiety. (Tr. 138, 143.) At the hearing, when asked by the ALJ what side effects she experienced from her medication, she replied, "Always tired, always tired," and when asked which drugs made her tired, she responded,

> I would say the Paxil somewhat, the lithium.   I'm not touching these medicines because every time my medicines have been changed, you know, drastically, I end up in the hospital for another hospital stay.

(Tr. 534.)

She also testified that while she tried to fight the tendency to take naps during the day, if she did not, she was "extremely tired by early evening" and that she had "memory loss where I don't remember stuff."   (Tr. 549.) As she noted in a questionnaire concerning her activities of daily living, "due to the bipolar disorder and the medications I take, I require much more sleep than the average person [but] without this medication I cannot function at all."   (Tr. 120.) Her mother testified to Plaintiff's incoherency, inability to think quickly, confusion, being "awful

---

[32] Paxil (paroxetine) is a selective serotonin re-uptake inhibitor ("SSRI") used to treat depression, panic disorder, social anxiety disorder, obsessive compulsive disorder, generalized anxiety disorder, and posttraumatic stress disorder. It is also used in combination with other drugs to treat bipolar disorder.  SSRIs work by increasing the amount of serotonin, a natural substance in the brain that helps maintain mental balance, but this class of drugs has numerous physical side effects.   Medline Plus.

out of it," and being "tired all the time."[33] (Tr. 557-558.)
Finally, in addition to this testimony, Dr. Antonowicz's notes
contain numerous references to fatigue, lack of concentration,
memory loss, sleep disturbances, dizziness, and lightheadedness.

Had the ALJ misstated the record on only one or two points and
if there were other substantial evidence to support his ultimate
conclusion, we would most likely conclude that such errors were
harmless.  We find, however, that the ALJ relied extensively on
"facts" which are not supported by the record.  His conclusion that
Ms. Bowers's affective disorder did not result in disability does
not, therefore, rest on substantial evidence and must be reversed.

2. *Failure to give proper weight to the opinions of Dr.*
*Antonowicz.*  The second major area in which the ALJ erred was by
failing to give controlling weight to the opinions of Dr.
Antonowicz, Plaintiff's long-term treating physician.[34]  Social

[33]  The Court recognizes that Ms. Bowers's mother is not an
"acceptable medical source" as that term is defined by the Social
Security Administration.  *See* 20 C.F.R. § 404.1513(a), defining
acceptable medical sources as licensed physicians, optometrists, and
podiatrists; licensed or certified psychologists; and qualified
speech-language pathologists.  However, as the regulations make clear,
evidence of a claimant's impairment may also be provided by
individuals who are not acceptable medical sources, e.g., counselors,
nurse-practitioners, physicians' assistants, early intervention team
members, public and private social welfare agency personnel, and other
non-medical sources, including, for example, "spouses, parents and
other caregivers."  20 C.F.R. § 404.1513(d)(4).

[34]  Social Security regulations identify three general categories
of acceptable medical sources: treating, non-treating, and non-
examining.  20 C.F.R. § 404.1502.  Physicians, psychologists and other
acceptable medical sources who have provided the claimant with medical
treatment or evaluation and who have had an "ongoing treatment
relationship" with her are considered treating sources.  A

26

Security regulations carefully set out the manner in which medical opinions are to be evaluated.   20 C.F.R. § 404.1527(d).   In general, every medical opinion received is considered.   Unless a treating physician's opinion is given controlling weight, the ALJ will consider (1) the examining relationship (more weight given to the opinion of an examining source than to the opinion of a non-examining source); (2) the treatment relationship (more weight given to opinions of treating sources); (3) the length of the treatment relationship and the frequency of examination (more weight given to the opinion of a treating source who has treated the claimant for a long time on a frequent basis); and (4) the nature and extent of the treatment relationship (more weight given to the opinions of specialist than to generalist treating sources.) 20 C.F.R. § 404.1527(d); *see also* Fargnoli v. Massanari, 247 F.3d 34, 43 (3d Cir. 2001), and Sykes, 228 F.3d at 266 n7.  The opinions of a treating source are given controlling weight on questions concerning the nature and severity of the claimant's impairment(s) when the conclusions are "well-supported by medically acceptable clinical and laboratory diagnostic techniques and [are] not inconsistent with the other substantial evidence in [the] record." 20 C.F.R. § 404.1527(d)(2).

---

non-treating source is one who has examined the claimant but does not have an ongoing treatment relationship with her, for example, a one-time consultative examiner.  Id.  Finally, non-examining sources, including state agency medical consultants, are those whose assessments are premised solely on a review of medical records.  Id.

We note initially that there was no consultative physician who performed an independent psychological examination to assess Plaintiff's mental state, nor were there records from any other mental health care providers with whom Plaintiff might have consulted. With the exception of records pertaining to her three hospitalizations, Dr. Antonowicz is the only psychiatric specialist whose notes appear in the record. The ALJ stated that "with the exception of vocational conclusions that the claimant was disabled or unable to work, great weight was given to reports from treating sources" (Tr. 21), however, that appears not to be accurate.

There is no substantive medical evidence which outweighs Dr. Antonowicz's opinions as to the severity and disabling effects of Plaintiff's bipolar disorder. The ALJ points to a comment in March 2005 by another of Ms. Bowers's physicians, Dr. Michael Schlechter, that her bipolar disorder was "moderate." (Tr. 20, *citing* Exhibit 22F.) While this is true, Dr. Schlechter was an internist treating Ms. Bowers at that time for a chronic cough, not a specialist in psychiatry. (Tr. 441.) Thus, his opinion as to the severity of her mental condition would be entitled to less weight than that of a psychiatrist. The ALJ also cites to Dr. Schlechter's notes in Exhibit 10F for his finding that in May 2005, "no indications of depression were noted." (Tr. 20.) Exhibit 10F covers the period September 12, 2001 to August 24, 2004, thus nothing therein could

28

pertain to Ms. Bowers's medical condition as of May 2005.[35]

Moreover, when considering Dr. Antonowicz's medical reports, the ALJ picks and chooses those facts which support a finding that Ms. Bowers was not disabled. As a single example, we consider the following paragraph:

As of June 2004, . . . Dr. Antonowicz stated that the claimant's depression was improving. By June 2005, she was doing reasonable [sic] well and by October she was greatly improved. She continued to do well through August 2005 and by November she was very much improved and her dosage of Paxil was reduced.

(Tr. 20, *citing* Exhibits 24F and 27F.)

Taken in context, the first sentence concerning the doctor's impression as of June 2004 is correctly stated, that is, by June 2, 2004, Ms. Bowers's depression had improved as compared to depression so severe that she had stopped working two weeks before. (Tr. 471.) Rather than seeing Ms. Bowers on a monthly basis as he had previously done, Dr. Antonowicz saw her every two weeks in June 2004 while attempting to alleviate her depression so that she could return to work. At the end of the month, he noted she was

---

[35] In the brief in support of his motion for summary judgment, Defendant further notes that on May 25, 2004, "nearly three weeks after Plaintiff alleged an onset of disability," Dr. Jerry R. Singer noted that Plaintiff had no complaints of depression or anxiety and described her depressive disorder as in "partial remission." (Def.'s Brief at 3, *citing* Tr. 285-286.) First, May 25, 2004, is only one day after Plaintiff's alleged onset date, not three weeks. Moreover, Dr. Singer is not, according to the record, a specialist in psychiatric disorders, but rather an internist whom Plaintiff consulted for high blood pressure. Finally, one must question the accuracy of Dr. Singer's records, particularly since he noted that "she sees Dr. Tan regularly for depression." (Tr. 284.) By May 2004, Ms. Bowers had been treated by Dr. Antonowicz for almost two years. (*See* Tr. 252.)

29

doing a little better in terms of relief of depression
but she still feels anxious, has very poor concentration.
Her sleep is better.  She still seems far too distressed
to make a return to work a realistic option at this time
and we agreed to another two weeks to see if she
stabilized further.

(Tr. 469, notes from June 21, 2004.)

The ALJ then compares her status one year later in the second

sentence.    What he omits from this comment, however, is Dr.

Antonowicz's report that although she was "doing reasonably well,"

"her degree of compensation seems to be marginal and I think it

unlikely that she will be able to return to work in the immediate

future."  (Tr. 464, notes of June 27, 2005.)  The Court cannot find

any reference in Dr. Antonowicz's notes to support the ALJ's

statement that "by October she was greatly improved" because there

appear to be no notes from October 2005 as one would infer from the

chronological order implied in this sentence. [36]

The ALJ's statement that she continued to do well through

August 2005 is substantiated by the record (Tr. 488), as is the

statement that "by November she was very much improved."    (Tr.

486.)  What the ALJ completely omits is the fact that Ms. Bowers

was hospitalized again for ten days in the interim.  Describing her

condition as "much improved" on November 17, 2005, without taking

---

[36]  The ALJ could not have been referring to a note from October
13, 2004, because the doctor wrote then that Ms. Bowers "returns
really not having improved a great deal."  (Tr. 489.)  If the ALJ is
referring to a note from October 29, 2003, when Dr. Antonowicz wrote
that she "continues to do well" (Tr. 494), we find the juxtaposition
of information from June 2004, June 2005, October 2003, August 2005,
and November 2005 in itself to be extraordinarily misleading.

30

into account a mood swing so severe it resulted in hospitalization hardly constitutes substantial evidence of continuous improvement.[37]

Similar errors of omission occur in the ALJ's reference to GAF scores. He refers twice to the same GAF score of 58, which Dr. Antonowicz reported on July 2, 2004. (Tr. 19, *see also* Tr. 252-253.) He fails to mention other reported scores of 25 (Tr. 171, May 2003), 55 (Tr. 171, June 2003), 48 (Tr, 373, October 2004), and 50 (Tr. 482, December 2005), indicating that on multiple occasions Ms. Bowers was demonstrating marked limitations in social functioning. *See* Langley v. Barnhart, 373 F.3d 1116, 1122 n.3 (10th Cir. 2004) ("A GAF score of 41-50 indicates serious symptoms or serious impairment in social, occupational, or school functioning, such as inability to keep a job.") "The failure to acknowledge a GAF score in and of itself can result in remand, in particular when the GAF score indicates serious symptoms or impairments in social

---

[37] The ALJ made numerous other errors of interpretation or citation in considering Dr. Antonowicz's opinions. For instance, he states that "in Exhibit 26F, the doctor noted the presence of no more than mild to moderate symptoms and he gave the claimant a GAF rating of 58." (Tr. 19.) Exhibit 26F is the medical questionnaire completed by the doctor in January 2006 in which he indicated that Ms. Bowers had marked difficulties in three of the four B criteria of Listing 12.04 and gave her a GAF score of 50, not 58, as of December 5, 2005. (Tr. 481-482.) Similarly, the statement based on Exhibit 24F that six months before this report, Dr. Antonowicz "noted that she was better stabilized than at any time in the past" is incorrect. In April (not June) 2005, Dr. Antonowicz actually wrote: "We are not going to make any changes [in her medication.] I discussed this with Ms. Bowers and *she feels* that this has stabilized her better than what we have tried in the past." (Tr. 465, emphasis added.) While Ms. Bowers may have felt better stabilized, that is not necessarily the doctor's opinion. And, again, this apparent stability was ultimately belied by Ms. Bowers's manic phase just six months later, resulting in a 10-day hospitalization.

31

or occupational functioning." Holmes v. Barnhart, CA No. 04-5765, 2007 U.S. Dist. LEXIS 21769, *31-*32 (E.D. Pa. Mar. 27, 2007), citing Span v. Barnhart, CA No. 02-7399, 2004 U.S. Dist. LEXIS 12221, *21-*23 (E.D. Pa. May 21, 2004), and Escardille v. Barnhart, CA No. 02-2930, 2003 U.S. Dist. LEXIS 11085, *20-*22 (E.D. Pa. June 24, 2003).

In the brief in support of his motion for summary judgment, Defendant argues that Dr. Antonowicz's opinions are inconsistent with other substantial evidence of record which includes Plaintiff's GAF of 58 to 60, Dr. Kowalski's expert opinion, and Plaintiff's successful medication regimen. (Docket No. 14, "Def.'s Brief," at 15.) Given the nature of bipolar disorder, it is not surprising that Plaintiff would experience periods of no more than moderate limitations in social and occupational functioning as reflected in GAF scores in the 51 to 60 range. See DSM-IV, supra at n.24. As she stated at the hearing, "I have good days." (Tr. 548.) Presumably, her "bad days" are reflected in the GAF scores between 41 and 50 and should have been given equal consideration.

As to Defendant's next argument, the law is explicitly clear that the opinions of Dr. Kowalski, a non-examining physician, are entitled to less weight than those of Plaintiff's long-term treating physician. See 20 C.F.R. § 404.1502. Contrary to Defendant's assertion, there is no evidence in the record that Dr. Kowalski is "a psychiatrist trained in assessing whether a claimant

meets or equals a listed mental impairment." (Def.'s Brief at
11.) Rather, he is identified only as a medical doctor. (Tr.
382.) It also seems counter-intuitive to cite Dr. Kowalski's
opinion as substantial evidence in conflict with that of Dr.
Antonowicz since the ALJ explicitly noted that Dr. Kowalski's
"report is not substantiated by any medical evidence," and thus
gave it no more than "reduced weight." (Tr. 20.)

As to the evidence of Plaintiff's stability on her medication
regime, the Court agrees that symptoms which are reasonably
controlled by medication are not disabling.[38]  See Dearth v.
Barnhart, No. 01-3356, 2002 U.S. App. LEXIS 10162, *3 (3d Cir.
2002), citing Gross v. Heckler, 785 F.2d 1163, 1166 (4th Cir.
1986)("If a symptom can be reasonably controlled by medication or
treatment, it is not disabling"); see also 20 C.F.R. § 404.1530
("In order to get benefits, you must follow treatment prescribed by
your physician if this treatment can restore your ability to
work.") There is no evidence that Plaintiff did not follow all the
medical advice she received, yet a comprehensive reading of the
record shows that while she achieved periods of greater or lesser

---

[38]  The case cited by Defendant for this principle, Brown v.
Bowen, 845 F.3d 1211, 1215 (3d Cir. 1988), is distinguishable on its
facts. There, the objective medical blood tests showed that the
claimant's drug levels were below the therapeutic level; consequently,
he was unable to satisfy the listing for major motor seizures which
required him to show that his impairment persisted despite following
prescribed anti-convulsive treatment. Brown, 845 F.2d at 1214-1215.
There is no comparable requirement in Listing 12.04, nor is there any
evidence that Plaintiff failed to adhere to Dr. Antonowicz's
prescribed drug treatments.

33

stability, her mood swings between depression and manic behavior continued despite Dr. Antonowicz's close review of her medication and frequent objective medical tests to ascertain that she was receiving proper dosages. (See, e.g., Tr. 494, 496, and 500-501 re: various laboratory blood tests.) Finally, the fact that a claimant's mental condition is stable and well controlled with medication in a therapeutic environment does not negate a treating physician's opinion that the claimant would have a limited ability to function in the work setting. As the Third Circuit Court of Appeals has pointed out, "For a person . . . who suffers from an affective or personality disorder marked by anxiety, the work environment is completely different from home or a mental health clinic. [The treating physician's] observations that [she] is 'stable and well controlled with medication' during treatment does not support the medical conclusion that [she] can return to work." Morales, 225 F.3d at 319.

The ALJ also rejected entirely Dr. Antonowicz's conclusions that Ms. Bowers was disabled. (Tr. 19, citing 20 C.F.R. § 404.1527 for the principle that a doctor's statement that a claimant is disabled is not determinative of her disability status.) The ALJ specifically cited Social Security Ruling[39] ("SSR") 96-5p for the

---

[39] "Social Security Rulings are agency rulings published 'under the authority of the Commissioner of Social Security' and 'are binding on all components of the Social Security Administration.'" Sykes, 228 F.3d at 271, citing 20 C.F.R. § 402.35(b)(1). "Rulings do not have the force and effect of the law or regulations but are to be relied upon as precedents in determining other cases where the facts are

proposition that the "legal authority to draw conclusions as to a
claimant's disability status is specifically reserved to the
Commissioner." (Tr. 19.) While it is true that opinions (even by
treating sources) that an individual is disabled and unable to work
are not entitled to controlling weight or special significance, it
does not mean that such opinions are to be rejected in their
entirety. The same Social Security Ruling cited by the ALJ,
"Medical Source Opinions on Issues Reserved to the Commissioner,"
states: "[O]ur rules provide that adjudicators must always
carefully consider medical source opinions about any issue,
including opinions about issues that are reserved to the
Commissioner. . . . [O]pinions from any medical source on issues
reserved to the Commissioner must never be ignored." Thus, while
the ALJ was not required to give controlling or even great weight
to Dr. Antonowicz's opinion that Ms. Bowers was disabled and unable
to return to work, it was error to reject that opinion without
analysis and without citation to contradictory medical evidence.

   While the ALJ may accept some parts of the medical evidence
and reject other parts, he must consider all the evidence and give
some cogent reason for discounting the evidence he rejects,
particularly when he rejects evidence that suggests a contrary
disposition. Adorno v. Shalala, 40 F.3d 43, 48 (3d Cir. 1994). An

_____

basically the same." Sykes, id., quoting Heckler v. Edwards, 465 U.S.
870, 873 n3 (1984).

ALJ's reliance on those portions of the medical record which purportedly support his ultimate determination while rejecting those which do not "runs afoul of the general rule that an ALJ is not entitled to pick and choose through a physician's opinion." Sklenar v. Barnhart, 195 F. Supp. 2d 696, 703, n.6 (W.D. Pa. 2002), adopted by Sklenar v. Barnhart, CA No. 01-122, 2002 U.S. Dist. LEXIS 6821 (W.D. Pa. Mar. 27, 2002). We find, unfortunately, that the ALJ's conclusions that Ms. Bowers showed steady improvement in her mental impairments and that her condition was stable reflects just such selective use of medical evidence.[40] Thus, we conclude that in light of the entire medical record, the ALJ's failure to give controlling weight to Dr. Antonowicz's medical opinions was an error of law and must be reversed.

3. *Failure to properly analyze the C criteria of Listing 12.04.* We turn to the third major error by the ALJ, that of failing to explain his reasoning why Ms. Bowers did not satisfy the C criteria of Listing 12.04. As noted above, as an alternative to

---

[40] Defendant perpetrates the same error in his brief in support of the motion for summary judgment. The Commissioner compares, for instance, Dr. Antonowicz's form report dated September 27, 2004, in which he indicated that Ms. Bowers's ability to perform work-related activities was no more than slightly to moderately impaired (see Tr. 370-371) with his conclusion on January 9, 2006, that she satisfied Listing 12.04 (see Tr. 479-482.) Not only are these two opinions rendered more than two years apart, the conclusion drawn by Defendant completely ignores the facts that in the interim, Dr. Antonowicz noted that her GAF was 48; she showed "scant improvement" despite ongoing medication; her stability was "not entirely optimal;" her functioning was "fairly low level;" she remained very sensitive to stress, and her compensation was "marginal."

showing that she satisfies the A criteria plus any two of the four B criteria, a claimant may satisfy this Listing first by showing that she has a medically documented history of a chronic affective disorder which has lasted at least 2 years, causing more than a minimal limitation of ability to do basic work activities, and with symptoms or signs currently attenuated by medication or psychosocial support. The ALJ does not discuss whether Plaintiff satisfies this condition, but there can be no question Plaintiff's mental impairments had lasted some twenty years, not just two, and that beginning in November 2002, her condition limited her ability to do basic work activities on three separate occasions when she was hospitalized for manic episodes. Moreover, her symptoms were intermittently attenuated by medication and psychosocial support between November 2002 and April 2006 with varying success.

The ALJ's entire analysis of the other C criteria consists of the following:

> The claimant has not experienced repeated episodes of decompensation during the period at issue[41]. . . There is

---

[41] Ms. Bowers also argues that she satisfied the "repeated episodes of decompensation" requirement described in either Listing 12.0B(4) or Listing 12.04C(1). (Plf.'s Brief at 11.) A review of the medical record shows that she did not experience three such episodes within one year; rather her first two episodes occurred approximately six months apart and the last some sixteen months later for a total elapsed period of about three years. The Listing provides, however, that where the claimant has experienced more frequent episodes of shorter duration or less frequent episodes of longer duration, the adjudicator "must use judgment to determine if the duration and functional effects of the episodes are of equal severity and may be used to substitute for the listed finding in a determination of equivalence." Listing 12.00C(4). If we were remanding the case for

37

no indication that a minimal increase in mental demands or change in the environment would result in decompensation. The claimant does not have a history of one or more years' inability to function outside a highly supportive living arrangement or a continuing need for such arrangement. Therefore, the claimant's condition does not meet the criteria outlined in paragraph C of Listing 12.04.

(Tr. 18.)

At no point in his opinion does the ALJ identify the medical evidence on which he bases this conclusion. Based on the record, it could be easily argued that the "minimal increase in mental demands" associated with Ms. Bowers's return to work between September 2003 and May 2004 increased her depressive symptoms which (at least in part) caused her to stop working as of May 24, 2004. In fact, Dr. Antonowicz identified medical problems and work-related stressors as psychosocial and environmental problems in July 2004. (Tr. 253.) _Compare_ Knudsen v. Barnhart, CA No. 02-4108-MWB, 2004 U.S. Dist. LEXIS 5243, *17 (N.D. Iowa Mar. 30, 2004), noting that where the claimant experienced no episodes of decompensation when she was not working, it was logical to infer that the work environment could be a cause of her deterioration. Moreover, "a highly supportive living arrangement" does not necessarily mean an institutional environment. As the regulations

---

further consideration, we would suggest that the ALJ determine if Ms. Bowers's "less frequent episodes" were of "longer duration" than two weeks, taking into account the assistance provided by her family each time she was released from the hospital, and, if so, she thereby satisfied the "equal severity" portion of the Listing. However, in light of the fact that the Court is granting benefits directly, we need not consider this alternative analysis.

point out, "highly structured and supportive settings may also be found in your home. Such settings may greatly reduce the mental demands placed on [the claimant.] With lowered mental demands, overt symptoms and signs of the underlying mental disorder may be minimized." Listing 12.00F. As discussed above, Ms. Bowers's mother and brothers provided supportive home environments for her following at least two of her hospitalizations and her mother testified that she continued to assist her on a regular basis. (Tr. 556.) Plaintiff also received home nursing care visits from a case worker on a weekly basis which could be presumed to provide additional mental support. (Tr. 548-549.)

While we do not necessarily find that Plaintiff satisfied the C criteria of Listing 12.04, we do find troubling the ALJ's cursory discussion of this point. Omission of the systematic analysis of the C criteria is error, particularly when viewed in combination with other omissions and selective use of Plaintiff's medical history.

4. *The ALJ's credibility analysis.* Finally, we conclude that the ALJ's conclusory statement regarding Ms. Bowers's credibility does not satisfy the requirements of this Circuit. In order to give an ALJ's credibility determination the "great deference" it is generally due, the ALJ must articulate reasons to support that determination. Horodenski v. Comm'r of Soc. Sec., No. 06-1813, 2007 U.S. App. LEXIS 2874, *16 (3d Cir. Feb. 7, 2007); *see*

39

*also* <u>Reefer v. Barnhart</u>, 326 F.3d 376, 380 (3d Cir. 2003)
(appellate courts generally defer to an ALJ's credibility
determination  because the ALJ is present at the hearing and can
assess a claimant's demeanor.)  Here, the ALJ's entire credibility
determination consists of a single sentence:

> After considering the evidence of record, the undersigned
> finds that the claimant's medically determinable
> impairments could reasonably be expected to produce the
> alleged symptoms, but that the claimant's statements
> concerning the intensity, duration and limiting effects
> of these symptoms are not entirely credible.

(Tr. 20.)

SSR 96-7p requires that

> [w]hen evaluating the credibility of an individual's
> statements, the adjudicator must consider the entire case
> record and give specific reasons for the weight given to
> the individual's statements. . . . The determination . .
> . must contain specific reasons for the finding on
> credibility, supported by the evidence in the case
> record, and must be sufficiently specific to make clear
> to  .  .  .  any subsequent reviewers the weight the
> adjudicator gave to the individual's statements and the
> reasons for that weight.

SSR 96-7p, "Evaluation of Symptoms in Disability Claims: Assessing
the Credibility of an Individual's Statements."

The same Social Security Ruling sets out seven factors the ALJ
must consider: (1) the extent of daily activities; (2) the
location, duration, frequency, and intensity of pain or other
symptoms; (3) precipitating and aggravating factors; (4) the type,
dosage, effectiveness, and side effects of any medication, (5)
treatment other than medication for the symptoms; (6) measures used
to relieve pain or other symptoms; and (7) other factors concerning

functional limitations and restrictions due to pain or other symptoms.

Here, the ALJ failed entirely to identify the "specific reasons" for finding Ms. Bowers "not entirely credible" and cites to no evidence in the case record. While he did address in detail Plaintiff's activities of daily living and her social functioning, there is no discussion of the other factors he is directed to consider. Further in that regard, the Court notes "it is well established that sporadic or transitory activity does not disprove disability." Smith v. Califano, 637 F.2d 968, 971-72 (3d Cir.1981); see also Zurawski v. Halter, 245 F.3d 881, 887 (7th Cir. 2001)("The fact that a claimant is able to engage in limited daily activities, such as washing dishes, doing laundry, and cooking meals does not necessarily demonstrate that she is not disabled."). Dr. Antonowicz commented on at least two occasions, well after she stopped working, that her ability to function was "fairly low" and that she led "a very limited existence." (Tr. 490; 465.)

As a second factor, it appears the ALJ failed to incorporate in his credibility determination any consideration of Plaintiff's long work record. It is well-established that a claimant with a long, productive work history will be given "substantial credibility" when describing her work limitations. Dobrowolsky v. Califano, 606 F.2d 403 (3d Cir. 1979). In Dobrowolsky, the plaintiff had worked as a meat-cutter, despite repeated

41

hospitalizations for coronary problems as well as a number of other impairments. Id. at 403-404. After his release from the hospital following an automobile accident, Dobrowolsky attempted to work for another year, but could do so only sporadically because of his medical conditions. At his hearing, Dobrowolsky testified that recurrent pain prevented him from performing even light work. The Third Circuit Court of Appeals concluded that:

> testimony of subjective pain and inability to perform even light work is entitled to great weight, particularly when, as here, it is supported by competent medical evidence. Moreover, when the claimant has a work record like Dobrowolsky's twenty-nine years of continuous work, fifteen with the same employer, his testimony as to his capabilities is entitled to substantial credibility.

Dobrowolsky, 606 F.2d at 410.[42]

We recognize, of course, that an ALJ is not required to discuss every piece of evidence in the record, nor is he required to equate a long work history with credibility. Brubaker v. Barnhart, CA No. 05-76, 2005 U.S. Dist. LEXIS 36790, *23 (E.D. Pa. Dec. 29, 2005). However, as discussed above, Ms. Bowers's testimony about her inability to work is supported by competent medical evidence from Dr. Antonowicz covering a period of almost

_____

[42] See also Taybron v. Harris, 667 F.2d 412-413 (3d Cir. 1981); Podedworney v. Harris, 745 F.2d 210, 213 (3d Cir. 1984); Sidberry v. Bowen, 662 F.Supp. 1037-38 (E.D. Pa 1986); Murgia v. Bowen, CA 87-2789, 1988 U.S. Dist. LEXIS 1350, *2, *7 (E.D. Pa. Feb. 16, 1988); Moyer v. Shalala, 828 F.Supp. 354 (E.D. Pa. 1993); Rieder v. Apfel, 115 F. Supp.2d 496, 505 (M.D. Pa. 2000); Jackson v. Barnhart, CA No. 02-4458, 2003 U.S. Dist. LEXIS 13912, *23 (E.D. Pa. Aug. 4, XX 2003); and Lang v. Barnhart, CA No. 05-1497, 2006 U.S. Dist. LEXIS 95767, *33-*36 (W.D. Pa. Dec. 6, 2006), all following Dobrowolsky in similar work-history situations.

four years.  But the Court is unable to find in the ALJ's opinion
any acknowledgment of the fact that Ms. Bowers worked, apparently
productively, for the same agency from 1987 to 2004, including two
attempts to return to work after her decompensations in November
2002 and May 2003.

Because the ALJ failed to explain his reasoning for finding
Plaintiff "not entirely credible," and because he failed to
incorporate in his analysis any acknowledgment of her testimony
that she could not perform any substantive gainful activity, we
find that the ALJ erred in his credibility determination.

F.   Conclusion

Social Security Ruling 85-15 provides in relevant part
that where a person's mental impairment is not of listing severity
but

> does prevent the person from meeting the mental demands
> of past relevant work and prevents the transferability of
> acquired work skills, the final consideration is whether
> the person can be expected to perform unskilled work.
> The basic mental demands of competitive, remunerative,
> unskilled work include the abilities (on a sustained
> basis) to understand, carry out, and remember simple
> instructions; to respond appropriately to supervision,
> coworkers, and usual work situations; and to deal with
> changes in a routine work setting. A substantial loss of
> ability to meet any of these basic work-related
> activities would severely limit the potential
> occupational base.  This, in turn, would justify a
> finding of disability because even favorable age,
> education, or work experience will not offset such a
> severely limited occupational base.

In this case, there is overwhelming evidence from Dr.
Antonowicz that Plaintiff's impairments prevent her from

43

performing, on a sustained basis, the basic mental demands of competitive work as described in Social Security Ruling 85-15. For the numerous reasons above, we find that the ALJ erred at step three of his analysis and should have found that the extent of Ms. Bowers's disability due to her affective disorder either satisfied Listing 12.04 or was the equivalent thereof.

## V.   FURTHER PROCEEDINGS

"A district court, after reviewing the decision of the Commissioner, may under 42 U.S.C. § 405(g) affirm, modify, or reverse the Commissioner's decision with or without a remand to the Commissioner for a rehearing." Newell v. Comm'r of Soc. Sec., 347 F.3d 541, 549 (3d Cir. 2003). However, the reviewing court may award benefits "only when the administrative record of the case has been fully developed and when substantial evidence on the record as a whole indicates that the plaintiff is disabled and entitled to benefits." Krizon v. Barnhart, 197 F. Supp.2d 279, 291 (W.D. Pa. 2002), quoting Podedworney v. Harris, 745 F.2d 210, 222 (3d Cir. 1984).

We conclude that this is one of those relatively rare instances in which benefits may be awarded without further development of the record or further consideration by the ALJ. There is no substantial evidence to refute Dr. Antonowicz's opinion as to the severity of Plaintiff's bipolar disorder, an opinion which should have been given controlling weight by the ALJ. Had he

44

done so, he would have concluded without question at step three of the analysis that Ms. Bowers was disabled.    We therefore grant Plaintiff's motion for summary judgment, reverse the Commissioner's April 28, 2006 decision, and award disability insurance benefits from May 24, 2004.    An appropriate order follows.

June  27th , 2007

William L. Standish
United States District Judge

cc:   Counsel of Record

45